## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

```
UNITED STATES OF AMERICA ex rel.  :
RICHARD MONDA,                     :
        Plaintiff,                 :
                                   :
v.                                 :   Civil No. 3:99cv1026 (JBA)
                                   :
SIKORSKY AIRCRAFT CORP. and        :
UNITED TECHNOLOGIES CORP.,         :
        Defendants                 :
```

### RULING ON DEFENDANTS' MOTION TO DISMISS [DOC. # 76]

Richard Monda, a federal government auditor, has brought this <u>qui tam</u> action[1] against defendants Sikorsky Aircraft Corporation ("Sikorsky") and United Technologies Corporation ("UTC")[2] under the provisions of the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733.  The FCA imposes liability on "[a]ny person" who "knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval."  31 U.S.C. § 3729(a)(1).  In addition to authorizing government enforcement, the FCA permits a private person (a "relator") to bring a civil action "for the person and for the United States Government."  31 U.S.C. § 3730(b)(1).

---

[1] <u>Qui tam</u> is short for <u>qui tam pro domino rege quam pro se ipso in hac parte sequitur</u>, which means "who as well for the king as for himself sues in this matter."  Black's Law Dictionary (8th ed. 2004).

[2] Sikorsky, formerly a division of UTC, is the manufacturer of Black Hawk helicopters and other related military components.  Since the relationship between the defendants is not at issue in consideration of the motion to dismiss, the defendants will be grouped together as "Sikorsky."

The defendants now move to dismiss [Doc. # 76] Monda's claims on several grounds.  For the reasons that follow, the defendants' motion will be granted.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

In 1989, a Sikorsky employee brought a <u>qui tam</u> action alleging that UTC had used improper billing practices to defraud the federal government.  Am. Compl. [Doc. # 64] ¶ 50; see <u>United States ex rel. Keeth v. United Technologies Corp.</u>, Civ. No. H-89-323 (AHN).  UTC settled the case in 1994 for $150 million.  <u>Id.</u> In response to the allegations in <u>Keeth</u>, the Department of Defense ordered its Defense Contract Audit Agency ("DCAA")[3] to investigate Sikorsky's accounting practices concerning the government's 1992 contract with Sikorsky for three hundred Black Hawk helicopters.  <u>Id.</u> ¶¶ 54-55.  As a senior auditor with the DCAA, Monda was part of a team charged with reviewing the new billing system at Sikorsky beginning in June 1994.  <u>Id.</u> ¶ 56. During the audit, Monda discovered various accounting irregularities which he interpreted to show that Sikorsky was billing the government for helicopters and parts that had been diverted to other customers instead of being delivered to the military.  <u>Id.</u> ¶¶ 59-88.  Monda followed DCAA procedures and reported this information to his superiors, but no remedial

---

[3] According to 32 C.F.R. pt. 290, App. A (2005), "DCAA was established by the Secretary of Defense under Department of Defense (DoD) Directive 5105.36 (32 C.F.R. part 357) and began operating on July 1, 1965.  Its Director reports to the Comptroller of the Department of Defense."

action was taken.  Id. ¶¶ 89-92.

Following the conclusion of the audit in September 1994, Monda continued to pursue his suspicion that Sikorsky was using false and misleading billing practices with respect to the 1992 contract.  Id. ¶ 93.  Once it became clear that the Department of Justice was not going to pursue these allegedly unlawful practices, Monda filed this qui tam action on April 27, 1999 in accordance with the filing provisions of § 3730(b)(2).  Id. ¶ 95. In his complaint, Monda alleged that Sikorsky violated § 3729(a) by diverting helicopters and parts and "failing to expeditiously reimburse the United States."  Id. ¶¶ 101, 108, 115. Specifically, Monda alleged that Sikorsky's accounting practices violated various sections of the Federal Acquisitions Regulations (FAR) promulgated under 41 U.S.C. § 421(c).  Id. ¶¶ 27-30; see 48 C.F.R. §§ 1.101, 201.301(a).

After receiving numerous extensions, the Government filed a Notice of Election to Decline Intervention on March 13, 2003. Am. Compl. ¶ 97; see 31 U.S.C. § 3730(b)(4)(B).  Monda filed an Amended Complaint on November 4, 2004, and defendants moved to dismiss on January 25, 2005.  In their motion, defendants allege that Monda failed to plead the elements of fraud with particularity pursuant to Fed. R. Civ. P. 9(b), that this Court lacks subject matter jurisdiction over the claims under § 3730(e)(4), and that Monda should not be permitted to personally

3

recover because as a government auditor he was compelled to
uncover fraud due to the express terms of his employment.  Mot.
to Dismiss at 1.

## II.  DISCUSSION

Defendants contend that the relator did not comply with Fed.
R. Civ. P. 9(b), which requires that "[i]n all averments of fraud
or mistake, the circumstances constituting fraud or mistake shall
be stated with particularity."  In his Amended Complaint, relator
bases his § 3729(a) allegations "on information and belief,"
without describing with specificity any actual false claims that
were improperly submitted by Sikorsky to the government.  Mem. of
Law in Support of Mot. to Dismiss at 26-28.  Defendants argue
that, since Monda has made only broad, vague allegations, they
cannot prepare an adequate defense without knowing the essential
elements of the alleged fraud.  <u>Id.</u> at 30-33.  Monda responds
that he has pleaded the fraud with sufficient specificity.  Mem.
of Law in Opp'n. at 37-39.  Additionally, he argues that since
the Rule 9(b) standard depends on the factual circumstances, the
pleading requirements here should be relaxed because the details
of the fraud are peculiarly within the defendants' knowledge.
<u>Id.</u> at 35-37.

### A.   <u>Pleading Standards for Fraud under Rule 9(b)</u>

The Second Circuit has interpreted Rule 9(b) as requiring a
plaintiff to:

> (1) detail the statements (or omissions) that the
> plaintiff contends are fraudulent, (2) identify the
> speaker, (3) state where and when the statements (or
> omissions) were made, and (4) explain why the
> statements (or omissions) are fraudulent.

Harsco Corp. v. Segui, 91 F.3d 337, 347 (2d Cir. 1994); see
Cosmas v. Hassett, 886 F.2d 8, 11 (2d Cir. 1989).  Other courts
have characterized this pleading standard as the "who, what,
when, where, and how" of the alleged fraud.  See e.g. United
States ex rel. Willard v. Humana Health Plan of Texas, Inc., 336
F.3d 375, 385 (5th Cir. 2003); DiLeo v. Ernst & Young, 901 F.2d
624, 627 (7th Cir. 1990).  While claims arising under the FCA are
different from claims of common-law fraud, the heightened
standard imposed by Rule 9(b) nevertheless applies.  Gold v.
Morrison-Knudsen Co., 68 F.3d 1475, 1477 (2d Cir. 1995)
("[C]laims brought under the FCA fall within the express scope of
Rule 9(b)."); see also United States ex rel. Karvelas v. Melrose-
Wakefield Hosp., 360 F.3d 220, 228 (1st Cir. 2004) (noting that
"every circuit court that has addressed this issue has concluded
that the heightened pleading requirements of Rule 9(b) apply to
claims brought under the FCA").

The mere existence of a fraudulent scheme is insufficient
for FCA liability; rather, "[a] defendant has violated the FCA
only when he or she has presented to the government a false or
fraudulent claim" for payment.  Karvelas, 360 F.3d at 225; see
also Harrison v. Westinghouse Savannah River Co., 176 F.3d 776,

5

785 (4th Cir. 1999) ("a central question in [FCA] cases is
whether the defendant ever presented a false or fraudulent claim
to the government"); <u>United States ex rel. Clausen v. Lab. Corp.
of Am., Inc.</u>, 290 F.3d 1301, 1311 (11th Cir. 2002) ("[t]he
submission of a false claim is . . . the <u>sine qua non</u> of a False
Claims Act violation").  In <u>Karvelas</u>, the First Circuit further
described the relationship between an FCA claim and the Rule 9(b)
standard:

> In a case such as this, details concerning the dates of
> the claims, the content of the forms or bills
> submitted, their identification numbers, the amount of
> money charged to the government, the particular goods
> or services for which the government was billed, the
> individuals involved in the billing, and the length of
> time between the alleged fraudulent practices and the
> submission of claims based on those practices are the
> types of information that may help a relator to state
> his or her claims with particularity.

360 F.3d at 233.  Though this does not constitute a mandated
"checklist," the relator's complaint must contain at minimum some
of this information in order to be sufficient under Rule 9(b).
<u>Id.</u>  Although the relator in <u>Karvelas</u> pleaded "at considerable
length the defendants' sixteen schemes to defraud the
government," his complaint was defective because he did not
identify "the dates or content of any particular false or
fraudulent claim allegedly submitted for reimbursement."  <u>Id.</u>
Karvelas instead relied on inferences based on circumstantial
evidence that the defendant hospital submitted false Medicare and
Medicaid claims to the government during a three-year period.

6

Id. at 234.  Even though he averred substantial evidence that a
fraudulent scheme was afoot, the court nevertheless dismissed his
action, holding that his "failure to identify with particularity
any actual false claims that the defendants submitted to the
government is, ultimately, fatal to his complaint." Id. at 235.

    The Eleventh Circuit reached the same result in Clausen,
holding that, notwithstanding details of an allegedly fraudulent
scheme, it was inadequate to allege only that false claims "must
have been submitted, were likely submitted, or should have been
submitted to the Government."  290 F.3d at 1311.  In Clausen, the
relator described the defendant's improper billing and testing
procedures but offered only "conclusory statements" as to the
culmination of the scheme – the submission of false claims for
payment:

> No amounts of charges were identified.  No actual dates
> were alleged.  No policies about billing or even
> second-hand information about billing practices were
> described, other than to state that [certain standard
> forms] were used.  No copy of a single bill or payment
> was provided.

Id. at 1312.  Similarly, the D.C. Circuit has concluded that
relators must plead sufficient details about when the alleged
fraud occurred to satisfy Rule 9(b).  See United States ex rel.
Williams v. Martin-Baker Aircraft Co., Ltd., 389 F.3d 1251, 1257
(D.C. Cir. 2004) (dismissing the claim because "the open-ended
time span alleged in the complaint failed to give [defendants]"
adequate notice); United States ex rel. Joseph v. Cannon, 642

7

F.2d 1373, 1385 (D.C. Cir. 1981) (requiring relators to "state the time, place and content of the false misrepresentations") (quotation omitted).

Turning to the allegations in this case, Monda faces the same pleading deficiency as did the relators in Karvelas and Clausen.  Monda describes the 1992 Black Hawk contract with the government, the arrangements to sell helicopters to foreign countries, the relevant federal regulations governing defense contract accounting, the "suspect accounts" at Sikorsky, and Sikorsky's history of improper billing practices.  Mem. of Law in Opp'n. at 37-39.  However, he admits that he does not have copies of or specific knowledge about the progress bills that Sikorsky allegedly submitted.  Id. at 37.

In his amended complaint, Monda makes no specific factual allegation supporting his conclusion that Sikorsky violated federal accounting procedures.  "On information and belief," Monda alleges, defendants agreed to seek prior approval from the government before diverting helicopter components and to exclude and/or reimburse the government for the costs of any such components from the progress bills submitted pursuant to the 1992 contract.  Am. Compl. ¶¶ 37-39.  He offers no details of any compliance failure by defendants.  Monda also does not cite to nor describe any of the progress bills which he presumes Sikorsky submitted and which he suspects were false or fraudulent.  Id. ¶¶

40-45.  In the critical allegations, Monda uses generalized language:

> 40.  On information and belief, defendants submitted periodic Progress Bills to the United States for 80% of the costs incurred in the production of BLACK HAWK helicopters and related parts . . .

> 41.  On information and belief, defendants submitted the progress Bills no less than monthly over the course of the contract . . .

> 42.  On information and belief, defendants submitted with each Progress Bill a Certification attesting . . . that the Progress Bill had been prepared "in accordance with" the 1992 Contract . . .

Id. ¶¶ 40-42.  Furthermore, even though Monda elaborates on his allegations in his affidavit accompanying his Opposition Memorandum, he still offers no greater detail:

> On information and belief, contrary to federal regulations, and contrary to the Certifications in the Progress Bills, defendants did not exclude the costs of diverted inventory from the 1992 Contract, nor did they expeditiously reimburse or credit the United States for those products.

Monda Aff. ¶ 37.  Without particularized allegations describing how specific progress bills were submitted in a manner inconsistent with the relevant regulations, there is no way to determine whether Sikorsky actually submitted false claims for payment under the 1992 contract, or whether the accounting oddities noted by Monda were caused by something unrelated.  The most that Monda does is speculate "on information and belief" as to the nature and existence of such false claims.

**B.    The Factual Elements Are Not Peculiarly Within Defendants' Knowledge**

Monda further argues that "the degree of particularity" required to satisfy Rule 9(b) varies depending on the circumstances.  Mem. of Law in Opp'n. at 35.  Under the Second Circuit standard, fraud allegations "cannot be based on information and belief," except with respect to facts that are "peculiarly within the opposing party's knowledge, in which event the allegations must be accompanied by a statement of the facts upon which the belief is based."  DiVittorio v. Equidyne Extractive Indus., Inc., 822 F.2d 1242, 1247 (2d Cir. 1987).  Nevertheless, "[t]his exception to the general rule must not be mistaken for license to base claims of fraud on speculation and conclusory allegations."  Wexner v. First Manhattan Co., 902 F.2d 169, 172 (2d Cir. 1990).  Plaintiffs who plead on information and belief "must adduce specific facts supporting a strong inference of fraud or it will not satisfy even a relaxed pleading standard."  Id.

Though Monda cites two district court opinions as supporting his contention that the relaxed standard should be applied here, both appear distinguishable.  In Beth Israel Medical Center v. Smith, 576 F. Supp. 1061, 1070-71 (S.D.N.Y. 1983), a case involving civil RICO claims, the court found the complaint in compliance with Rule 9(b) since it detailed the defendants' fraudulent methods and included the "exact dates and amounts of

10

many of the alleged payments."  Similarly, the court in Zito v. Leasecomm Corp., No. 02 Civ. 8074 (GEL), 2003 WL 22251352 at *28 (S.D.N.Y. Sept. 30, 2003), permitted the plaintiffs' consumer fraud claims to proceed because they in fact identified and attached to their complaint the particular representations alleged to be fraudulent.  In this case, however, despite his access to Sikorsky business records during the three-month-long DCAA audit, Monda has produced no copy or description of a single claim for payment that he alleges to be false.  He attaches only his correspondence with his supervisors and Sikorsky personnel regarding his investigation and a blank copy of "Standard Form 1443, Contractor's Request for Progress Payment."  Monda Aff., Ex. 5-17.

The Second Circuit cases cited by Monda, see Stern v. General Elec. Co., 924 F.2d 472, 477 (2d Cir. 1991); Schlick v. Penn-Dixie Cement Corp., 507 F.2d 374, 379 (2d Cir. 1974), overruled on other grounds by Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1100-06 (1991); Segal v. Gordon, 467 F.2d 602, 608 (2d Cir. 1972), are of limited usefulness as they recognize the uncontroverted existence of the relaxed standard. In fact, the court in Schlick explained that the prototypical example of when to permit pleading on information and belief is the derivative suit, where shareholders "have little information about the manner in which the corporation's internal affairs are

conducted and hence are rarely able to provide details as to the alleged fraud."  507 F.2d at 379; see also Segal, 467 F.2d at 608 (finding that "simple allegations should suffice for claims of fraud in an informer's action or a derivative suit and primary reliance should be placed on the discovery process for uncovering factual details").  Unquestionably, Monda was in a different position than were the shareholder plaintiffs, having had access to at least some of the defendants' records and employees. Moreover, as the Second Circuit observed in a securities fraud case:

> the so-called relaxed standard does not eliminate the
> particularity requirement, although we recognize that
> the degree of particularity required should be
> determined in light of such circumstances as whether
> the plaintiff has had an opportunity to take discovery
> of those who may possess knowledge of the pertinent
> facts.

Devaney v. Chester, 813 F.2d 566, 569 (2d Cir. 1987).  The court then held that since the plaintiff "fail[ed] to adduce any specific facts supporting an inference" of fraud, his complaint should be dismissed for failing to plead with sufficient particularity.

Even if a lower pleading standard could be applied in FCA cases, the facts here do not support affording such relaxation to Monda.  Despite Monda's contention that the government kept him from investigating the fraud in more detail, see Mem. of Law in Opp'n. at 37, he in fact had three months to examine Sikorsky

12

records and interview its personnel.  Am. Compl. ¶¶ 56, 90.

Additionally, by his own description, Monda is "among the highest

rated auditors" in his office, and is well-regarded for his

"thoroughness" and "integrity."  Am. Compl. ¶ 34.  As such, it is

difficult to see how facts supporting the alleged fraud here are

"peculiarly within" the defendants' knowledge relative to Monda

given that he, a competent and experienced auditor, was given an

opportunity to audit Sikorsky's financial documents.  See Monda

Aff. ¶ 58.  Therefore, as Monda in the course of his audit had

opportunity to obtain factual detail supporting his fraud theory

relating to specific false certifications on claims Sikorsky

submitted to the government, the pleading standard imposed by

Rule 9(b) should not be relaxed.

Furthermore, even assuming that the critical information is

particularly within Sikorsky's knowledge, Monda has nevertheless

failed to set forth facts which support his belief that Sikorsky

submitted false claims.  See DiVittorio, 822 F.2d at 1247.

According to his Opposition Memorandum:

> While Mr. Monda does not have possession [of] the
> Progress Bills presented and submitted by defendants to
> the government, he has alleged the existence of a
> contract providing for progress payments; that each
> Progress Bill included a certification that it had been
> prepared "in accordance with" the 1992 Contract, that
> "work reflected [in the Progress Bill] had been
> performed," and that "the quantities" of work done
> "were consistent with the requirements" of the 1992
> Contract as mandated by 48 C.F.R. § 53.301-1443; and
> that such certifications were false but that the claims

for payment based thereon were nevertheless presented
to the government for payment.

Mem. of Law in Opp'n. at 37.  However, the paragraphs of his
amended complaint on which Monda relies in making this argument,
see Am. Compl. ¶¶ 4-14, 40-45, are all based on his "information
and belief."  In other words, outside of alleging the existence
of the 1992 Black Hawk contract, that some components were
transferred elsewhere, that federal regulations impose certain
requirements on such transferring, and that Sikorsky had a
sizable accrued inventory account, there are no facts set forth
by Monda to support the inference that false progress bills
necessarily were submitted in furtherance of this fraud.  As
Sikorsky notes, the FAR permit contractors to divert inventory
and to reimburse the government for the costs of such items in
one of several ways.  See 48 C.F.R. §§ 32.501-4(a)(1)(ii),
32.503-15(d), 252.242-7004(e)(7).  Monda has not adduced facts
showing that Sikorsky disregarded these regulations or otherwise
failed to receive government approval.  Absent these elements,
there is insufficient information to support a "strong inference"
that defendants defrauded the government in violation of the FCA.

     At oral argument, Monda's counsel referenced the fact that
the complaint in Keeth, the earlier UTC case, passed Rule 9(b)
muster.  A comparison of the two shows several important
differences between the allegations in Keeth and those advanced
by Monda here.  See Monda Aff., Ex. 1 at 4.  First, the relator

14

was a Sikorsky employee who brought suit only after reporting to his superiors in writing his suspicions of fraudulent claims submissions and requesting that they cease. <u>Id.</u> at 5. Not only did Sikorsky fail to respond to his internal allegations, but it also directed the relator to destroy all copies of his report and conceal all inculpatory admissions. <u>Id.</u> Furthermore, the nature of the fraudulent allegations was different in kind, since Keeth alleged in great detail the process by which Sikorsky obtained the "interest-free loan" – the exact contract numbers and dates, the precise time span during which fraudulent claims were submitted, and the ways in which the company concealed the claims. <u>Id.</u> at 5-8, 11-16.[4]

---

[4] Representative examples of the <u>Keeth</u> relator's particularized allegations include:

> (d) From December 1984 through April 1988, defendant improperly ceased subtracting the costs of spare parts issued from General Stores from the total parts allocated to the Government, for progress billing purposes, in General Stores.

> . . . .

> 11. Early in 1976, defendant instituted what became known as its "Commitment Report (CR) methodology" to develop its progress payment billings. At least by 1983, defendant was aware that this methodology generated a theoretical, fictitious inventory which inflated the amounts in General Stores that could be progress billed.

> . . . .

> 15. In response to Government complaints about this practice, defendant falsely represented to the Government in 1985 that by reducing its CR progress payment billings by a fixed 5% decrement, any overpayments would be eliminated. The Government accepted defendant's representations, and defendant, thereafter, reduced its progress payment billings by a 5% decrement calculated on the General Stores balance utilized in its CR method.

Monda Aff., Ex. 1 ¶¶ 7(d), 11, 15.

###### C.   **Disposition**

Under <u>Devaney</u>, a court may dismiss the plaintiff's claims without leave to amend if he has "already been granted a prior opportunity to replead fraud with greater specificity."  813 F.3d at 569.  In this case, defendants' 9(b) claim was outlined at a status conference and Monda was permitted to file an amended complaint to address these dismissal grounds, which he filed on November 4, 2004.  Given the period of time he had since originally filing this action in 1999, and this final opportunity for amending, Monda has had ample opportunity to attempt to comply with Rule 9(b).  Therefore, his claims will be dismissed without leave to replead.

###### D.   **Additional Arguments**

Aside from the pleading deficiency discussed above, this case presents an interesting threshold question: to what extent did Congress intend the FCA to apply to federal government auditors such as Monda, who uncover fraud solely by performing their express duties?  In her dissenting opinion in <u>United States</u> <u>ex rel. Holmes v. Consumer Ins. Group</u>, 318 F.3d 1199, 1215 (10th Cir. 2003), Chief Judge Tacha observed that it is unlikely Congress intended such a scenario given the myriad federal laws and regulations prohibiting federal employees from having a

personal financial stake in their jobs.[5]  Monda uncovered what he
termed "suspect accounts" while auditing Sikorsky's billing
procedures for the Department of Defense.  He attempted to
persuade the government to pursue what he perceived as fraud at
Sikorsky, but was unsuccessful.  Whether or not the government
chose to act on the information provided by Monda is of no
consequence; either way, the argument runs, he should not be
permitted to take evidence recovered while acting in the course
of his employment duties to seek a potentially large recovery for
himself personally.

Interesting as the issue may be, in this case it is
unnecessary to reach the question of whether Monda's claims are
jurisdictionally barred either by 31 U.S.C. § 3730(e) or the
significant conflicts of interest which appear in this case,
since Monda has failed to plead with specificity the elements of
fraud as he is required to do under Rule 9(b).

---

[5] Various regulations prohibit:

   the use of public office for private gain, 5 C.F.R. §§ 2635.101(b)(7),
   2635.702; the use of government property or government time for personal
   purposes, 5 C.F.R. §§ 2635.704, 2635.705; the trafficking in "inside
   information" for personal advantage, 5 C.F.R. §§ 2635.101(b)(3),
   2635.703(a); the participation in any government matter in which the
   employee has a financial interest, 5 C.F.R. §§ 2635.402, 2635.501,
   2635.502; and last but not least, the holding of financial interests
   that may conflict with the impartial performance of government duties, 5
   C.F.R. § 2635.403.

United States ex rel. Fine v. Chevron U.S.A., Inc., 72 F.3d 740, 747 (9th Cir.
1995) (Trott, J., concurring).  Also note that 18 U.S.C. § 208 "impose[s]
criminal penalties on government employees who participate in matters in which
they have financial interests."  Holmes, 318 F.3d at 1225 (Tacha, C.J.,
dissenting).

**IV.   CONCLUSION**

Accordingly, defendants' motion is GRANTED and the relator's claims are dismissed.  The Clerk is directed to close this case.


IT IS SO ORDERED.

/s/

_____
JANET BOND ARTERTON, U.S.D.J.

**Dated at New Haven, Connecticut, this 10th day of August, 2005.**

18